Royce ZINK and LeLoie Zink, Plaintiffs-Respondents,

v.

The PITTSBURG & MIDWAY COAL MINING CO., a corporation, and Spencer Chemical Company, a corporation, Defendants-Appellants.

No. 8210.

Springfield Court of Appeals.

Missouri.

Jan. 8, 1964.

Michael J. Bogutski, Kansas City, Stinson, Mag, Thomson, McEvers & Fizzel, Kansas City, of counsel, for defendants-appellants.

John M. Belisle, Osceola, for plaintiffs-respondents.

RUARK, Presiding Judge.

This is defendants' appeal from a judgment for plaintiffs based on a jury verdict in the sum of eight thousand dollars. We will refer to the parties as designated below.

The petition combined in one count several possible causes of action in one conglomerate mass. Too lengthy to set forth verbatim, it charged that plaintiffs gave defendants' assignors and privies two separate coal mining leases on two separate and distinct tracts of land, one of 180 acres, another of 240 acres; that in said leases defendants contracted to mine the land in a good and workmanlike manner; that defendants drilled such land to determine

whether it would be practicable and profitable to mine; that parts of said land were underlain with Tebo coal and parts were underlain with Weir-Pittsburg coal; that Weir-Pittsburg vein coal and Tebo vein coal, when mixed in proper proportions, were salable; that, as to the 180-acre tract, defendants "warranted unto the plaintiffs" that by actual tests the land was "coal land and would be mined complete, and plaintiffs relied upon said warranties" and tore down improvements of the value of $15,000 to enable defendants to mine said tract; and that defendants constructed, cut, and built unnecessary and unreasonable roads across said 180 and so destroyed its value but mined only 70 acres of the 180 and left 110 acres, 80 acres of which is underlain with coal, unmined; that had the defendants mined the whole 180, plaintiffs would have received therefrom in excess of $48,000 in royalties, whereas in fact they received only $20,975; and that defendants have failed and refused to mine the balance of the 180 tract.

As to the 240-acre tract, plaintiffs charge that, contrary to good workmanlike methods, the defendants cut unnecessary drainage ditches on 70 acres of unmined land so as to destroy the value of such unmined portion of the 240-acre tract. The prayer was for $60,000 actual and $15,000 punitive damages.

On the taking of evidence, the plaintiffs, among other things, introduced evidence as to quantity of unmined coal left on the 180 tract and computations showing the expected royalty which could have been derived based on the royalty fixed in the written lease. According to plaintiffs' witness Crockett, approximately 80 acres, said to have been underlain with Weir-Pittsburg coal, were not mined. On cross-examination, he left the amount of this unmined coal acreage somewhat in doubt. Computing royalty at fifteen cents per ton, he calculated the to-be-expected royalty at $283.80 per acre; for the unmined portion $22,704. As to this 180-acre tract, plaintiffs

submitted and the court gave instruction numbered two, which is as follows:

"The Court instructs the Jury, that if you find and believe from the evidence herein, that the officers, and agents of the defendants or the officer, and agents of their predecessors, companies, did contract and agree with the plaintiffs herein, that prior to the laying out of truck road, and drainage ditches, on that portion of the 180 acres tract, underlain with Weir-Pittsburg Coal, given and described in evidence that test pitts would be dug and test made of the Weir-Pittsburg Coal under said tract, and if you further find and believe that the defendants, or their predecessor companies did run said test, and did advise the plaintiffs that they would mine, and take under their lease, the Weir-Pittsburg vein of coal under said land, if you so find, and if you further find and believe from the evidence that thereafter the plaintiffs did authorize the defendants to lay out and construct drainage ditches, and truck roads across that portion of the 180 acre tract so underlayed with Weir-Pittsburg Coal, and did remove and tear down valuable improvements located thereon, in reliance on the defendants' agreement to mine and take said coal, if you so find and if you further find that the defendants did mine only a portion of said 180 acres tract underlayed with, Weir-Pittsburg Coal, and then did abandoned and refused to mine the whole of said tract, if so, then you are instructed that your verdict must be for the plaintiffs, and you will award them such damage therefor as you may find and believe from the evidence, they were damaged, thereby on this count, of their petition."

By defendants' instruction numbered eight, the court told the jury they could not award damages for roads or ditches on the 180-acre tract, and by defendants' instruction numbered twelve, the jury were in-

structed that defendants were not required to mine unmerchantable coal.

As to the 240-acre tract, plaintiffs submitted on failure to mine in a workmanlike manner by cutting and constructing unnecessary roads and ditches. We will return to this 240-acre tract later herein.

Plaintiffs' measure of damages instruction was as follows:

"The court instructs the jury that if you find the issues in favor of the plaintiffs then you will award them such sums in damages as you find and believe from the evidence they have suffered all to be stated in one lump sum."

The two leases involved are too lengthy to set forth here but are substantially as follows: Plaintiffs leased to defendants' predecessors and alleged privies with "the right to prospect said premises for coal and to mine and remove by strip, surface or open face mining, quarry, shaft, slope, drift, or any other method of mining the coal on, in and underlying said premises, and to store, prepare for selling and sell said coal." Right of ingress and egress was granted. The leases extended for fifteen years and so long thereafter as coal "is" being produced in *paying quantities* [1] from said premises. Lessee was granted the right to use so much of the surface of said premises as may be *required, necessary,* or *convenient* for any and all purposes incidental to or connected with the prospecting, mining, removal, preparation, and selling of said coal, with right in the lessee to transport said coal to or from adjoining, nearby lands. Also granted was the right to make excavations, to divert water courses in any manner lessee might deem necessary or convenient, together with the right to drain and transport water from any pit working place over or through the premises. It was further provided that such leases might be worked in conjunction with other lands, in connection with which lessee was granted all necessary or convenient rights-of-way for ditches, water courses and ways, and rail and vehicle transportation over the leased land, even though mining on the leased premises might have ceased. The lessors expressly waived all lateral, subadjacent, adjoining, and other support as to any and all of said premises. The only specific penalty or restriction imposed was that lessee would pay for damage done to fences or crops in prospecting for coal.

Lessee was required to pay a royalty of fifteen cents per ton on all coal mined, removed, and sold but was not required to pay any royalty on rotten, dead, or unmerchantable coal. "Pyrites" and "sulphurs" and refuse materials removed in mining operations might be disposed of without payment of royalty. Lessee was required to conduct its operations in a good and workmanlike manner.

The tracts involved were partially underlain with a vein of what is called "Tebo" coal. The Tebo, in general, lay fairly shallow and so was mineable by use of shovel. There had been discovered in the area a deeper vein of coal known as Weir-Pittsburg.[2] Some exploration had been going on with respect to Weir. It is in respect to the failure to mine this Weir on the 180 tract which brings the claim of violation of contract. At the time of the occurrences which plaintiffs contend created a verbal contract to mine all of the Weir on the 180 tract, defendants were already mining Tebo on the (apparently adjoining or cornering) 240 tract. Weir (and also Tebo) had been discovered on the 180. Plaintiffs had a frame house, silo, and some shed buildings on the south side of the road along the north side of the 180. Plaintiff Royce Zink says that defendants had staked off five acres around these improvements with the idea that such area would not be mined. In the explorations in regard to the new and deeper vein of Weir (necessary to mine with drag line) it was found that it contained a high degree of sulphur and as such

---

1. All emphasis is our own.

2. We will hereafter refer to this as Weir.

was unmarketable, but defendants decided that it might be mined and marketed by mixing it with Tebo on an approximate basis of twenty-five per cent Weir to seventy-five per cent Tebo. The defendants employed plaintiff Zink, who was engaged in construction business, had some machinery, and had been engaged in strip coal mining operations on his own, to dig a test pit at some place not clear, but probably in the northeast portion of the 180. The defendants also opened a test pit on an 80-acre tract which they had under lease immediately west of plaintiffs' 180. Samples were taken, and then, according to Zink, "They came back and advised me that this coal would be mined, and asked me if I, then, if I wouldn't move these buildings, that *they would take all this coal clear out to the highway,* clear out to the public road, and that was my agreement with them, *if this coal tested to where they could use it,* and they did test it and advised me that it was marketable coal and that they *would take the full amount from this line here clear down to here.* We did not agree to take the Pittsburg-Weir vein out from under the Tebo vein." And again, " * * * he came to me and told me that they had made their tests and they would take this coal, and wanted to know how soon I could get these buildings moved off, because our agreement was *we should move them if they decided to take the rest of this coal."* This agreement, if it was an agreement, is denied as such by defendants. The undisputed evidence is that defendants were anxious to put a drainage ditch running east and west alongside the road on the north side of the 180 and at or in front of the site of plaintiffs' improvements. This was in the area underlain with Tebo. The plaintiffs did remove their improvements onto another farm which they owned (in

doing so it was necessary to remove one room of the house), and the drainage ditch was dug. The area in that portion of the tract (under and around where the improvements had been) was stripped, and plaintiffs got their royalty for it. Apparently, at about the same time stripping of Tebo was going on in this area, defendants also began mining Weir in another portion of the 180 and, also, at the same time, defendants conducted a drilling-testing operation to further explore the Weir deposit. Trouble developed in the quality of Weir, both in regard to sulphur content and, in some areas, in regard to "bone" and slate and other impurities. Extensive redrilling and testing was done. Operations (for Weir) were commenced at more than one location on the tract and then abandoned. The vein was uncovered in some places and then not mined because of the condition of the coal. Finally, after several attempts, mining was abandoned on this tract. In all, approximately a total of 41.9 acres of Tebo and 27.8 acres of Weir was mined on the 180 and royalties paid thereon.

■ Still adverting to the 180-acre tract, defendants pleaded the statute of frauds, Section 432.010 RSMo 1959, V.A.M.S., objected at the trial, and rely upon the statute here. There seems to be no contention that the statute is not applicable. The leases ran for fifteen years.[3]

■ Plaintiffs-respondents say that the enforceability of the verbal agreement is removed from the operation of the statute of frauds because plaintiffs fully performed, such performance having consisted of the moving of the improvements and in permitting the defendants to lay out haulage roads on ground not underlain with Tebo and in digging water courses on the tract. While there appears to be some di-

---

3. While the leases did not assign the ores in the ground, they gave the right to remove them as well as the right to disrupt the surface. We think they were at least capable of becoming an interest in the land. Last Chance Mining Co. v. Tuckahoe Mining Co., Mo.App., 202 S.W. 287; Desloge v. Pearce, 38 Mo. 588; Kirk v. Mattier, 140 Mo. 23, 41 S.W. 252; Coerver v. Crescent Lead & Zinc Corporation, 315 Mo. 276, 286 S.W. 3; see Thacker v. Flottman, Mo., 244 S.W.2d 1020.

vision of authority in Missouri, there are instances in which it is said that a full performance by one of the parties to a verbal contract "takes the contract out of the statute of frauds" and makes it enforceable in an *action at law*.[4] But the *creation* of a contract, by performance or otherwise, is a different thing from the *destruction* of one already made. Once a written contract has been executed, its subsequent modification to the extent of changing its terms in a material manner and so, in effect, destroying the contract as written, by proof of a verbal agreement, does violence to the statute of frauds and the parol evidence rule. Hence the general rule that the modification must likewise be in writing.[5] The purpose of the statute of frauds is to guard against the perjury which might be induced by the ease of establishing obligations by word of mouth. 49 Am.Jur., Statute of Frauds, § 23, p. 383. Equity courts have enforced unwritten contracts "within the statute" whenever necessary in order to prevent such statute's being used as a shield for fraud. Carlin v. Bacon, 322 Mo. 435, 16 S.W.2d 46, 69 A.L.R. 1. But the distinctions between law and equity remain, and, where no fraud is involved, the reason for applying the equity rule in a court of law should fail. Austin & Bass Builders, Inc. v. Lewis, Mo., 359 S.W.2d 711. We believe the proper rule is that destruction of a written contract within the statute by parol should not be accomplished in

a court of law. Last Chance Mining Co. v. Tuckahoe Mining Co., supra, Mo.App., 202 S.W. 287, and cases cited.

■ Modifications of the written contract have been permitted if the so-called "modification" is, in reality, a separate and distinct contract although concerning the same subject matter. In such a situation the new contract stands on its own feet independent of the original contract.[6] Such separate and distinct contract is distinguishable from an obligation which is merely supplementary to the original obligation. See Beckers-Behrens-Gist Lumber Co. v. Adams, Mo.App., 311 S.W.2d 70, 74; Hart v. Riedel, supra, Mo.App., 51 S. W.2d 891.

■ In the cases where the parol undertaking is to be considered as having created a new obligation, the undertaking and obligations therein expressed and said to have been created must be positive, clear, specific, definite, and so unequivocal as to leave no doubt as to the intention of the parties to change what had previously been in writing. There must be a clear assent to the same thing. 17A C.J.S. Contracts § 377, p. 435; Reed on the Statute of Frauds, Vol. 2, § 441; Luckey v. St. Louis & S. F. R. Co., 133 Mo.App. 589, 113 S.W. 703; Davis v. Holloway, 317 Mo. 246, 295 S.W. 105(3). And, as in all contracts, there must be a new and valid consideration.[7] The

4. 6 A.L.R.2d, pp. 1111, 1117; Hart v. Riedel, Mo.App., 51 S.W.2d 891; Hyde v. Henman, Mo.App., 256 S.W. 1088; Cochran v. Jefferson County Lumber Co., Mo. App., 132 S.W.2d 32; Hoene v. Edward Gocke Real Estate Co., 230 Mo.App. 175, 91 S.W.2d 137; Deu Friend v. McDermott, Mo.App., 251 S.W.2d 339; Missouri State Life Ins. Co. v. Early, 222 Mo. App. 1118, 13 S.W.2d 1097; see Burk v. Walton, 337 Mo. 781, 86 S.W.2d 92.

5. Ives v. Crawford County Farmers' Bank, 140 Mo.App. 293, 124 S.W. 23; Fisher v. Miceli, Mo., 291 S.W.2d 845; Pratt v. Schreiber, 213 Mo.App. 268, 249 S.W. 449; Roburt v. Holmes, 213 Mo.App. 195, 248 S.W. 646; Rucker v. Harrington, 52 Mo.App. 481.

6. Reed on the Statute of Frauds, Vol. 2, § 441; Newman v. Bank of Watson, 70 Mo.App. 135; Eastern States Refrigerating Co. v. J. W. Teasdale & Co., Mo.App., 211 S.W. 693; Hoene v. Edward Gocke Real Estate Co., supra, 230 Mo. App. 175, 91 S.W.2d 137; see Corbin on Contracts, § 307.

7. 17A C.J.S. Contracts § 376 p. 428(5); Reed on the Statute of Frauds, Vol. 2, § 445; 49 Am.Jur., § 535; p. 835; Reigart v. Manufacturers' Coal & Coke Co., 217 Mo. 142, 117 S.W. 61; Rexite Casting Co. v. Midwest Mower Corp., Mo.App., 267 S.W.2d 327; Fuller v. Presnell, Mo. App., 233 S.W. 502; State ex rel. Hoyt v. Shain, 338 Mo. 1208, 93 S.W.2d 992; Warren v. A. B. Mayer Mfg. Co., 161 Mo. 112, 61 S.W. 644.

performance which is claimed as a consideration for the new (verbal) contract must be one which is referable *solely* to the oral contract and not such as might reasonably be referable to the original contract.[8] And (in considering such performance) a mere *nonaction* is not "performance" either partial or complete. 49 Am.Jur., Statute of Frauds, § 551, p. 856; Hawkins v. Studdard, 132 Ga. 265, 63 S.E. 852.

■ The written lease contained no reservation in regard to the improvements or the ground under and around them. The only item for which defendants were required to pay damages was destruction of fences and growing crops. The lease expressly waived all lateral, subadjacent, adjoining, and other support. Certainly the defendants would not have had the right to destroy such improvements unless necessary and convenient to the mining purposes. But the improvements sat upon and were surrounded by "Tebo" land (apparently some forty acres of it), and defendants had the right to mine under the improvements; or, as defendants' witness testified, they could mine "around them." This last would have left such improvements sitting in a wasteland, as the exhibits show the land became in that area. The act, "performance," of the plaintiffs in salvaging such improvements by moving them onto another farm is just as consistent and referable to conduct under the written contract as it is with a new, different, and contradictory verbal agreement.

As to the permitting the digging of ditches and the making of truck hauling roads. While the written lease gave defendants the right to cut ditches and establish necessary and convenient roads, we do not find in the record any positive or affirmative act of the plaintiffs in regard to such roads and ditches. Plaintiffs' conduct in respect to such roads and ditches, if there were any, was nonaction rather than

performance, full or otherwise. Nor, if it were performance, was it necessarily inconsistent with the terms of the written lease.

■ Nor do we believe that the testimony of the plaintiff established a verbal contract which was sufficiently definite, clear, and specific as to the mutual obligations. The testimony was that defendants' agent said "that they would take all this coal clear out to the highway * * * if this coal tested to where they could use it, and they did test it and advised me that it was marketable coal and that they would take the full amount from this line here clear down to here." Is this to be construed as an agreement to pay for *all* the coal, Tebo and Weir?; rotten, bone, slate, sulphurous, or such coal as is marketable?; or such coal which is *operatively* mineable and could be produced in paying quantities? What does "here clear down to here" mean? The mere posing of the questions demonstrates that the agreement, if it was an agreement, was not clear, definite, and specific.

For the foregoing reasons, we believe that plaintiffs have not established a performance under a verbal agreement which "takes the case out of" the statute of frauds.

■ Referring to plaintiffs' instruction numbered four. Since the recovery as to this 180-acre tract was sought on contract and the theory was that defendants were required to take and pay for a certain quantity of coal, we think the instruction should have furnished some guide to the jury as to the measure of damages. See Johnson v. Girvin's Estate, Mo.App., 370 S.W.2d 163, 168. As it is, considering the nature of the case and the wide range which the testimony took, the jury were left with carte blanche to fix damages.

8. Willey v. Talkington, Mo., 312 S.W.2d 77; Meegan v. Illinois Surety Co., 195 Mo.App. 423, 193 S.W. 899; Dimick v. Snyder, Mo.App., 34 S.W.2d 1004, 1007; see Jones v. Linder, Mo., 247 S.W.2d 817; Roberts v. Clevenger, Mo., 225 S.W.2d 728, 729–730.

It may be that plaintiffs have a cause of action against the defendants for the failure to conduct their operations on this 180-acre tract in a reasonable and workmanlike manner, whereby they caused injuries to the land for which plaintiffs are entitled to damages, but that is not the theory upon which the case was tried and submitted.

As to the 240 acres. This was apparently Tebo land. One hundred twenty-six acres of it were mined. The petition alleged unworkmanlike mining methods in the construction of unnecessary drainage ditches. The instruction (numbered three) submitted on unnecessary ditches *and roads*. We find no claim of unnecessary roads (as to this tract) in the petition, nor do we recall any evidence that the roads so laid by the defendants were unnecessary.

■ We feel it is not necessary to consider at length the contentions concerning deficiencies of proof in regard to whether the drainage ditches on the 240 were laid out and constructed in a workmanlike manner. We do suggest that the evidence was somewhat indefinite. A statement that the witness "would not recommend" putting a ditch at a certain location, standing alone and without going further and explaining whether the location was unnecessary or improper for the purpose of furnishing drainage according to the problem involved, is insufficient to satisfy the requirement of proof that such was not in accordance with proper mining standards. Plaintiffs may be able to supplement their proof upon a retrial; but, since all of plaintiffs' claims have been incorporated in one count and submitted for recovery under one sum, the whole cause must be reversed and remanded in any event.

It is so ordered.

STONE and HOGAN, JJ., concur.